Slip Op. 14-123

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CP KELCO US, INC.,<br><br>            Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>            Defendant,<br><br> and<br><br>JUNGBUNZLAUER AUSTRIA AG,<br><br>            Defendant-Intervenor. | Before: Richard W. Goldberg, Senior Judge<br>Court No. 13-00287<br><br>**<u>PUBLIC VERSION</u>** |

<u>OPINION</u>

[Denying plaintiff's motion for judgment on the agency record.]

Dated:  October 22, 2014

*Matthew J. Clark*, *Nancy A. Noonan*, *Matthew L. Kanna*, and *Keith F. Huffman*, Arent Fox LLP, of Washington, DC, for plaintiff.

*David A.J. Goldfine*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With him on the brief were *Dominic L. Bianchi*, General Counsel, and *Neal J. Reynolds*, Assistant General Counsel for Litigation.

*Frederick P. Waite*, *Kimberly R. Young*, and *William M.R. Barrett*, Vorys Sater Seymour and Pease LLP, of Washington, DC, for defendant-intervenor.

Goldberg, Senior Judge:  Plaintiff CP Kelco US ("Kelco"), a domestic manufacturer of

xanthan gum and petitioner in the antidumping proceeding that underlies this case, challenges the

final determination of the International Trade Commission (the "Commission") that domestic

industry suffered no present material injury by reason of subject imports.  *Xanthan Gum from*

*Austria and China*, 78 Fed. Reg. 43,226 (ITC July 19, 2013) (notice of final determination);

*Xanthan Gum from Austria and China*, USITC Pub. 4411, Inv. Nos. 731-TA-1202–1203 (July

2013) (final determination) (including public versions of both the "Views of the Commission"

and the "Staff Report," both hereinafter cited by reference to the confidential versions in the

administrative record).  Kelco's challenge takes the form of a motion for judgment on the agency

record, brought pursuant to USCIT Rule 56.2.

 For the reasons that follow, the court sustains the Commission's determination.

<u>**BACKGROUND**</u>

 On June 5, 2012, Kelco filed a petition with the Department of Commerce and with the

Commission.  Kelco alleged that less-than-fair-value imports from Austria and China were

materially injuring domestic industry, and were also threatening injury in the future.  *Xanthan*

*Gum from Austria and China*, 77 Fed. Reg. 34,997, 34,997–98 (ITC June 12, 2013) (initiation of

investigation).  When such petitions are filed, the Commission's responsibility is to determine

whether the petitioner or domestic industry has actually been, or will likely be, injured.  19

U.S.C. § 1673d(b) (2006).  (The Department of Commerce is responsible for making the prior

determination that less-than-fair-value importing has or has not occurred.  *Id.*)  After a hearing

and briefing on the matter, the Commission concluded that domestic industry was not suffering

material injury, and was only threatened with material injury by those imports emanating from

China.  Views of the Commission ("Views") at 3, 55–58, 60, CD 2-197 (Aug. 6, 2013), ECF No.

17 (Nov. 4, 2013).  The Commission explained this determination in its customary Views of the

Commission report.  Kelco challenges the Commission's final determination, specifically the

finding of no present material injury.  Pl.'s Mot. for J. on Agency R. 1–3, ECF No. 25 ("Pl.'s

Br.").

 Before reaching Kelco's specific claims, it is helpful to first foreground those claims with

an outline of the Commission's statutory objective and reasoning.  In assessing material injury to

domestic industry, the Commission is required to consider three factors: volume of subject imports, the price effects of such imports, and the impact of such imports on domestic producers. 19 U.S.C. § 1677(7)(B)(i)(I)–(III).  No one of the statutory factors need be dispositive.  *See Copperweld Corp. v. United States*, 12 CIT 148, 156, 682 F. Supp. 552, 561–62 (1988) (Commission is free to assign "to a factor a varying degree of significance depending upon the facts of a particular case").  The Commission must also check whether the filing of the antidumping petition caused a post-petition change in any of the factors, the theory being that filing can chill less-than-fair-value importing and hide injury.  19 U.S.C. § 1677(7)(I). If the Commission finds post-petition effects, it has discretion to discount the post-petition data in order to reach an accurate injury determination.  *Id.*

The Commission structured the Views of the Commission to align with this statutory framework.  It considered each factor individually and then post-petition effects before weighing the factors together and concluding that domestic industry had suffered no material injury.

## I.     Subject-Import Volume

The Commission's directive in considering subject-import volume is to evaluate "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  Kelco argued in administrative briefing that domestic industry had lost market share to subject imports in three out of five end-use market segments: consumer applications, food and beverage, and industrial applications.  According to Kelco, the only reason that domestic industry did not lose market share at the market-wide level was that these segment-specific losses were offset by a market-share gain in the oilfield segment.  Pre-hr'g Br.

at 19, CD 156 (May 14, 2013), ECF No. 17 (Nov. 4, 2013).[1]  Kelco further argued that domestic

industry's static overall market share was itself bad news, because apparent domestic

consumption had risen, and domestic industry should have captured a preferential share of this

growth.  *See* Post-hr'g Br. at 3, CD 2-170;174 (May 30, 2013), ECF No. 17 (Nov. 4, 2013).[2]

   In the Views of the Commission, the Commission acknowledged that subject-import

volume was significant under the statute and had increased in absolute terms.  Views at 36–37.

The Commission nonetheless emphasized that subject-import market share had remained

relatively stable at the market-wide level, though differing trends had manifested in different

market segments.  *Id.* at 36–37 & n.142.[3]

## II.   Price Effects

   The Commission's statutory task in evaluating price effects has two prongs:  The

Commission must examine both whether there has been price underselling in the United States

and also whether imports have led to price depression or price suppression.  19 U.S.C.

§ 1677(7)(C)(ii).[4]  In administrative briefing, Kelco demonstrated underselling.  Post-hr'g Br. at

---

[1] As suggested above, the aforementioned market segments are based on the end use of producers' xanthan gum.  *See, e.g.*, Staff Report at III-7 tbl.III-4, CD 2-179 (June 11, 2013), ECF No. 17 (Nov. 4, 2013).  This is how the term market segment is used throughout this opinion.
   It should be noted that the aforementioned terms are not here used to refer to the segments that are sometimes considered when defining the relevant *product* being imported. That is a separate, prior inquiry.  *See, e.g.*, *Bic Corp. v. United States*, 21 CIT 448, 452–54, 964 F. Supp. 391, 397–98 (1997).

[2] Apparent consumption is equal to production plus imports less exports. It is intended to measure total consumption, rather than to measure segment-by-segment consumption.  *Apparent Consumption*, Deardorff's Glossary of International Economics (2010), http://www-personal.umich.edu/~alandear/glossary/a html#ApparentConsumption.

[3] As reported in the Views of the Commission,
   The domestic industry's market share was [[    ]] percent in 2010, [[    ]] percent in 2011, and [[    ]] percent in 2012.  Cumulated subject imports' market share was [[    ]] percent in 2010, [[    ]] percent in 2011, and [[    ]] percent in 2012.  Nonsubject imports' market share was [[    ]] percent in 2010, [[    ]] percent in 2011, and [[    ]] percent in 2012.
Views at 31 (footnotes omitted) (citing Staff Report at C-5 tbl.C-1).

[4] Price suppression occurs when less-than-fair-value imports prevent domestic industry from raising prices when it otherwise would.  *See* 19 U.S.C. § 1677(7)(C)(ii)(II).  The Commission's normal methodology for

4–6.  Kelco also argued price suppression.  *Id.*  Kelco's method for detecting price suppression was to compare raw-materials costs to net sales ("NS") values, on the theory that any increase in raw-materials costs not mirrored in increased NS values showed price suppression.  Pursuant to this theory, Kelco provided evidence that increases in raw-materials costs had indeed outstripped NS-values gains, and that these increases would have been more noticeable had factory costs not decreased.  *Id.* at 4–5.  Kelco also noted that this trend was even more acute with respect to domestic industry's domestic sales, where NS average unit values ("AUVs") had actually decreased slightly (while raw-materials costs had still increased).  *Id.*

The Commission, in its analysis of price effects, acknowledged subject importers' underselling.  Views at 47.  But, looking to price depression and price suppression, the Commission concluded that the former was impossible, on grounds that domestic prices had generally [[           ]].  *Id.* at 48 (citing Staff Report at V-6, V-7 tbls.V-1 to V-16, CD 2-179 (June 11, 2013), ECF No. 17 (Nov. 4, 2013)).  The Commission further concluded that market-wide prices had not been suppressed, basing this conclusion on patterns in the COGS/NS ratio[5] during the period of investigation ("POI").  *Id.* (cross-referencing Views at 56–58).  As the Commission noted, although domestic producers' domestic-sales COGS/NS ratio [[      ]] from

---

determining whether price suppression has occurred is to compare ratios of the cost of goods sold ("COGS") to the value of net sales ("NS") over time ("COGS/NS ratio").  *See Siemens Energy, Inc. v. United States*, 38 CIT __, __, 992 F. Supp. 2d 1315, 1335 (2014)  (sustaining Commission's decision to use COGS/NS ratio to measure price suppression against substantial-evidence attack, and citing further precedent in support of this position); *Nucor Fastener Div. v. United States*, Slip Op. 13-65, 2013 WL 3033385, at *2 (CIT May 24, 2013) (referring to COGS/NS ratio as "the ratio the [Commission] commonly uses to analyze price suppression").  When the ratios increase (that is, when costs rise relative to sales value), price suppression may be occurring:  Presumably a manufacturer facing an increase in costs would respond by raising prices if possible. If raising prices is not possible, it may be because of third-party underselling.  Hence, an increase in COGS/NS ratios, also known as a "cost–price squeeze" provides a circumstantial measure of price suppression. *See, e.g.*, *Siemens* 38 CIT at __, 992 F. Supp. 2d at 1335.

Price depression occurs when less-than-fair value imports cause domestic industry to lower its prices.  *See* 19 U.S.C. § 1677(7)(C)(ii)(II).

[5] For a definition and explanation of this ratio, see *supra* note 4.

2010 to 2011—at first suggesting price suppression, *see supra* note 4—the same pattern occurred

in those producers' export-sales COGS/NS ratio. *Id.* at 56–58. The Commission concluded

from this information that domestic-sales price suppression could not have occurred, at least not

by reason of subject imports. *Id.* As for the COGS/NS ratio from 2011 to 2012, the Commission

noted that, although the domestic-sales ratio [[      ]] while the export ratio [[

]], the rise in the domestic ratio was too small to credit as price suppressing. *Id.*

### III.   Impact

The statute requires the Commission to evaluate impact by examining a number of

statutorily enumerated domestic performance indicators. 19 U.S.C. § 1677(7)(C)(iii). The

Commission recounted the performance-indicator data in detail, and then summarized: "Most of

the domestic industry's performance indicators improved or remained stable . . . although some

declined." Views at 53.[6] Kelco did not analyze domestic performance indicators in its

administrative briefing, at least as that briefing is excerpted in Kelco's motion appendix.

Confidential App. to Pl.'s Mot. for J. on Agency R., ECF No. 31.

---

[6] As reported in the Views of the Commission,

The domestic industry's production capacity was constant throughout the POI . . . . Its production increased . . . from 2010 to 2012. Its capacity utilization increased from . . . 2010 to . . . 2011, and declined . . . in 2012, for an overall increase . . . .

By quantity, the domestic industry's U.S. shipments declined from . . . 2010 to . . . 2011, and increased . . . in 2012, for an overall increase . . . . By value, the domestic industry's U.S. shipments declined from . . . 2010 to . . . 2011, but increased . . . in 2012, for an overall increase . . . . The industry's net sales revenues increased from . . . 2010 to . . . 2012 . . . . The domestic industry's end-of-period inventories declined . . . from 2010 to 2012.

Employment-related indicators showed improvement during the POI. The number of production and related workers, hours worked, and wages paid each increased from 2010 to 2012 . . . .

Notwithstanding these improvements, several of the domestic industry's performance indicators deteriorated during the POI. As previously discussed, the domestic industry's share of apparent U.S. consumption declined . . . . There were also some declines in financial performance. The domestic industry's operating income declined . . . from 2010 to 2012. As a ratio to net sales, the domestic industry's operating income declined from . . . 2010 to . . . 2012 . . . .

Research and development expenditures declined from . . . 2010 to . . . 2011, and increased . . . in 2012, for an overall decline  . . . . By contrast, capital expenditures declined from . . . 2010 to . . . 2011, and increased . . . in 2012, for an overall increase . . . .

Views of the Commission at 53–55 (footnotes omitted) (citing Staff Report at VI-8 tbl.VI-6, C-5 tbl.C-1).

### IV.    Post-petition Effects

After evaluating the material-injury factors, the Commission is required to consider "whether any change in [those factors] since the filing of the petition . . . is related to the pendency of the investigation."  19 U.S.C. § 1677(7)(I).  The reason for this provision is that, as "[t]his court and [the Commission] consistently have recognized[,] the initiation of antidumping and countervailing duty proceedings can create an artificially low demand for affected imports, thus distorting the data on which [the Commission] relies in making its [injury] determination." *USX Corp. v. United States*, 11 CIT 82, 88, 655 F. Supp. 487, 492 (1987) (citing *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 53, 592 F. Supp. 1318, 1324 (1984)).  Accordingly, if the Commission does find such post-petition effects, it "may reduce the weight accorded to the data for the period after the filing of the petition in making its determination of material injury," thereby curing the skewed injury data.  19 U.S.C. § 1677(7)(I).

Kelco argued in administrative briefing for a post-petition discount.  As one argument that the filing of the petition had distorted injury data, Kelco referenced a rise in domestic producers' U.S. shipments.  Pre-hr'g Br. at 17–18.  Kelco further noted that, even though subject producers' U.S. shipments had also risen, they had not kept pace with increases in U.S. apparent consumption.  Post-hr'g Br. at 7–9.  The upshot, according to Kelco, was that relative demand for subject imports (absolute demand relative to apparent consumption) declined after filing.  *Id.*

Kelco's second post-petition-effects argument was that the petition had buoyed domestic market share by encouraging purchasers to buy domestic product instead of subject imports. According to one domestic producer, [[                                                       ]], several purchasers had shifted from subject imports to [[        ]] expressly because of the filing of the petition.  Pre-hr'g Br. at 18–19.  Kelco said that this shift in production was the only thing that

kept domestic market share afloat.  Kelco added that the market-segmented data provided

circumstantial evidence of this:  Because the shifted purchases were all in the oilfield segment,

the actual market shares of other segments declined, proving Kelco's hypothetical.  Post-hr'g Br.

at 5–6.

> The Commission analyzed post-petition effects in a footnote:
>
> Although there is some evidence showing purchasers approached domestic
> producers with sales inquiries after the petition was filed, the record shows no
> apparent changes in the subject imports' volume and pricing behavior in the
> second half of 2012, *i.e.*, after the petition was filed.  Accordingly, we decline to
> give less weight to the annual 2012 data based on a post-petition effect.

Views at 56 n.223.  Thus, the Commission, though it acknowledged the arguments Kelco had

made at administrative briefing, ultimately concluded that subject producers' volume metrics and

pricing indicated that the filing of the petition had had no effect.  *Id.*

## V.   Material-Injury Finding

Having discarded the possibility of post-petition effects, the Commission's next task was

to weigh volume, price effects, and impact data together.  Doing so, it found no material injury to

domestic industry.  *Id.* at 55–58.  The Commission began at the end, with impact.  It recited "a

number of [performance] indicators [that had] improved during the POI," and concluded that the

overall indicator data did not suggest material injury.  *Id.* at 55–56.  The Commission next

harkened back to its volume analysis.  Apparently referencing Kelco's argument that domestic

market share should have grown alongside U.S. apparent consumption, the Commission insisted

that "[t]here is nothing atypical about [domestic producers'] share[] of total apparent U.S.

consumption remaining . . . relatively constant . . . ."  *Id.* at 56.  Finally, the Commission

addressed price effects (and also declines in domestic financial performance, which presumably

corresponded to price effects).  *Id.* at 56–57.  The Commission raised the issue of causation.

Any financial decline had not come from subject imports gaining market share because there was

no such gain.  Rather, domestic "industry's U.S. shipments rose and its market share was

essentially stable from 2010 to 2012."  *Id.*  Nor had subject imports spurred price effects.  This

the Commission demonstrated through the analysis of domestic-sales and export-sales COGS/NS

ratios described above.  *Id.* at 57–58.  Thus, taking all the data in sum, the Commission found no

material injury to domestic industry.

On appeal, Kelco raises two claims with respect to the Commission's conclusion.  First,

Kelco claims that, even if the Commission was correct in providing no post-petition discount, it

erred in its underlying material-injury analysis.  Pl.'s Br. 25–30.  Kelco argues that the

Commission's use of the COGS/NS ratio to measure price suppression was procedurally

improper, and that the Commission's injury analysis was unsupported by substantial record

evidence.  *Id.*

Second, Kelco claims that the Commission should have provided a post-petition discount.

*Id.* at 7–24.  Kelco makes three arguments that the Commission's post-petition analysis was

procedurally improper: (1) that the Commission's post-petition analysis was too short, Reply Br.

4–6, *see also* Pl.'s Br. 20–23, (2) that the Commission should have (but did not) presume that

any detected post-petition effects arose from the petition, Pl.'s Br. 5–8 & n.1, 20–23, Reply Br.

10–11, and (3) that the Commission was procedurally required to segment the market in its post-

petition analysis, *see* Pl.'s Br. 7–20.  Kelco further challenges the Commission's post-petition-

effects analysis on substantial-evidence grounds.  *Id.*

## SUBJECT MATTER JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction to hear this appeal under 28 U.S.C. § 1581(c) (2006).  The

court will uphold the Commission's decisions unless those decisions are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

The substantial-evidence standard is best understood as a word formula connoting

reasonableness review.  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir.

2006) (quoting *SSIH Equip. SA v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 381 (Fed. Cir. 1983));

*accord* 3 Charles H. Koch, Jr., *Administrative Law and Practice* § 9.24[1] (3d ed. 2013).

Accordingly, substantial evidence means "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion" taking into account the record as a whole.  *Consol.

Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Nippon Steel*, 458 F.3d at 1351.  Because the

administrative body at issue must take the record as a whole into account, it must necessarily

"address significant arguments and evidence which seriously undermines its reasoning and

conclusions." *Altx, Inc. v. United States*, 25 CIT 1100, 1117–18, 167 F. Supp. 2d 1353, 1374

(2001).  But the determination remains the administrative body's own to make:  This court's

function is merely to ascertain "whether there was evidence which could reasonably lead to the

Commission's conclusion."  *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933

(Fed. Cir. 1984).

## DISCUSSION

The court now considers Kelco's two claims, and sustains the Commission as to both.

First, the Commission's underlying determination of no material injury was procedurally and

substantively proper.  The Commission's use of the COGS/NS ratio to evaluate price effects was

in accordance with procedural requirements.  And the Commission's injury determination was

supported by substantial evidence.

Second, the Commission's finding of no post-petition effects likewise survives Kelco's procedural and substantive challenges. As a procedural matter, the Commission dedicated a sufficient portion of its inquiry to post-petition effects, and moreover had no duty to presume that any post-petition effects were caused by the petition, or to conduct a market-segmentation analysis. The Commission's post-petition-effects determination also satisfies the substantial-evidence standard. In any event, any error in the Commission's post-petition-effects analysis was harmless, because it would not have affected the underlying injury determination.

## I.     Assuming that the Commission Did Not Err in Finding No Post-petition Effects, its Underlying Injury Determination Was Supported by Substantial Evidence and Otherwise in Accordance with Law

Kelco's first claim is that, regardless of whether the Commission found post-petition effects, it erred in its underlying material-injury analysis. Kelco first raises a procedural argument, that the Commission should have used data other than the COGS/NS ratio to analyze price effects, *see* Pl.'s Br. 29, and that it misused the COGS/NS ratio in any case, *id.* at 24–25. Second, Kelco argues under substantial evidence that the Commission was obligated to consider market-segment data in evaluating material injury. *Id.* at 25–30. The court rejects both arguments.

## A.     The Commission's Use of the COGS/NS Ratio Was Procedurally in Accordance with Law

Kelco challenges the particular metric by which the Commission evaluated price suppression: the COGS/NS ratio. Kelco levies two arguments, the first implicit, the next explicit. First, Kelco focuses in its briefing on the ratio of raw-materials costs—a subcomponent of COGS—to net sales, thus implying that the Commission should have followed suit. Pl.'s Br. 29. But there is nothing unusual about the Commission's decision to focus on the COGS/NS ratio. *See Siemens Energy*, 38 CIT at __, 992 F. Supp. 2d at 1335; *Nucor*, 2013 WL 3033385, at

*2.  And the Commission's practice of focusing on the COGS/NS ratio, rather than a

subcomponent ratio, makes good sense:  Should an increase in one subcomponent of COGS be

offset by a decrease in another subcomponent, domestic industry would not have any need to

raise prices to avoid price suppression—the offset would handle that for it.  Indeed, as evident

from Kelco's own administrative briefing, that happened to a certain extent in this case.  Post-

hr'g Br. at 4–5 (noting that increased raw-materials costs were somewhat offset by decreasing

factory and other costs).  Kelco's implicit argument against the Commission's COGS/NS

methodology therefore fails.

     Kelco's second argument against the Commission's use of the COGS/NS ratio is more

explicit.  Kelco argues that the Commission's inference from the export-sales COGS/NS ratio

was improperly drawn because "[t]here is no record evidence suggesting that the domestic

industry faces no competition in its export markets."  Pl.'s Br. 25.  Kelco's point is that if there is

competition in the export markets, prices might be suppressed there too, such that comparison

between domestic and export markets does not disprove its position that the change in the

domestic COGS/NS ratio was caused by the subject imports.  But this mischaracterizes the

mechanics of the Commission's injury-and-causation inquiry.  The Commission's obligation is

not to disprove injury (whether in the form of shifts in volume, price effects, other impacts, or

some permutation thereof) or causation by subject imports.  Rather, the Commission must

affirmatively find both injury and causation.  *Comm. for Fair Coke Trade v. United States*, 28

CIT 1140, 1168 (2004) ("A finding of material injury requires a causal, not merely temporal,

connection between less than fair value sales and material injury.").  To make such a finding, the

Commission needs evidence.  In this case, the Commission noted that it had no evidence that any

change in the domestic COGS/NS ratio (an indication of possible price suppression) had been

caused by subject imports because such a change also occurred abroad.  If Kelco wanted to

overcome that absence of evidence, it needed to give proof—either proof of causation in the

domestic market, or that there is something more than a mere chance of export-market

competition.  Therefore, Kelco's second argument against the Commission's use of the

COGS/NS ratio also fails, and the whole of the Commission's COGS/NS analysis was

procedurally in accordance with law.

    **B.**       **The Commission's Determination of No Material Injury Was Supported by
Substantial Evidence**

     Kelco next argues that substantial record evidence compelled the Commission to at least

acknowledge market-segment data in evaluating material injury.  Pl.'s Br. 25–30.  By way of

clarification, Kelco is not claiming that the Commission is as a matter of law required to segment

markets in all of its material-injury determinations.  *See, e.g.*, Pl.'s Reply to Def.'s Resps.  11–

12, ECF No. 49 ("Reply Br.") ("Defendant construed Kelco's position to mean that the

Commission is required to perform a market segment analysis. Defendant mischaracterizes

Kelco's argument." (citation omitted)).  The Commission is certainly not required to segment the

market every time it considers material injury.  *See* 19 U.S.C. § 1677(4)(A) ("The term

'industry' means the producers *as a whole* of a domestic like product, or those producers whose

collective output of a domestic like product constitutes a major proportion of the total domestic

production of the product." (emphasis added)); *see also Tropicana Prods., Inc. v. United States*,

31 CIT 548, 559–60, 484 F. Supp. 2d 1330, 1341 (2007); *Cleo, Inc. v. United States*, 30 CIT

1380, 1399–1400 (2006); *Comm. for Fair Coke Trade* 28 CIT at 1166–67; *cf. Altx*, 25 CIT at

1113–15, 167 F. Supp. 2d at 1369–71 (holding that the Commission is not required to consider

segments of domestic industry injured by dumping separately from those segments perhaps less

injured because the producers in the latter segment also import subject imports); *Copperweld*, 12

CIT at 165–66, 682 F. Supp. at 569–70 (holding that the Commission is not required to consider

injury to individual producers).  *See generally Viraj Grp., Ltd. v. United States*, 343 F.3d 1371,

1377–78 (Fed. Cir. 2003) (holding that the court cannot compel the Department of Commerce to

conduct its analysis in a manner not mandated by statute).  Far from it:  Segmenting the market

can actually thwart the Commission's statutory duty, which is to determine whether the *entire*

*industry*, not *particular producers*, has been injured.  *Calabrian Corp. v. U.S. Int'l Trade*

*Comm'n*, 16 CIT 342, 354, 794 F.Supp. 377, 385 (1992) ("That Congress intended for the

Commission to consider the entire industry is clear"); *Altx*, 25 CIT at 1114, 167 F. Supp. 2d at

1369–70 ("Although one segment of the industry may benefit from dumping while another

segment is harmed, the statute does not permit the ITC to manipulate its material injury analysis

in favor of petitioners by focusing exclusively on the segment of the defined industry that is

harmed. . . .  With regard to evaluating the impact of subject imports, the statute requires the

Commission to focus on the 'state of the *industry*.'" (emphasis in original) (citations omitted));

*Copperweld*, 12 CIT at 165–66, 682 F. Supp. at 569 ("Th[e statutory] language makes it

manifestly clear that Congress intended the ITC [to] determine whether or not the domestic

industry (as a whole) has experienced material injury due to the imports.  This language defies

the suggestion that the ITC must make a disaggregated analysis of material injury.  Furthermore,

it appears that if Congress had intended that the ITC analyze injury on a disaggregated basis,

Congress would have made this intention explicit, as it did for example in regard to regional

industries.").  Given this clear precedent, Kelco is wise to avoid the contention that the

Commission is procedurally compelled to segment markets whenever it makes an injury

determination.

Rather, Kelco claims that substantial evidence in this particular case required the Commission to segment the market and find material injury.  Kelco grounds its claim in the Commission's finding that there was "predominant underselling" during the POI.  Views at 47; *see* Pl.'s Br. 29–30; Reply Br. 11–12.  According to Kelco, the Commission fashioned a "paradox" when it, despite acknowledging such underselling, nonetheless found neither a loss of domestic market share nor price effects.  Pl.'s Br. 29–30; Reply Br. 11.  Kelco adds that the solution to this so-called paradox was readily available to the Commission, insofar as Kelco had cited record evidence of segment-specific market-share fluctuations and price effects in its administrative briefing.  Pl.'s Br. 25–30; Reply Br. 11–12.  Kelco contends that by ignoring this evidence, the Commission violated the *Altx* rule that it "must address significant arguments and evidence which seriously undermines its reasoning and conclusions."  Pl.'s Br. 30 (citing *Altx*, 25 CIT at 1117–18, 167 F. Supp. 2d at 1374).  Furthermore, according to Kelco, the Commission did not ignore such segment-specific effects when analyzing threat of future injury, such that the Commission's omission when analyzing material injury was arbitrary.  Pl.'s Br. 29 (citing Views at 50).

The trouble with Kelco's argument is that there was no paradox to be resolved.  It must be remembered that the Commission's statutory duty is not to detect injury writ large.  *See Altx*, 25 CIT at 1114, 167 F. Supp. 2d at 1369–70.  Rather, it is to decide whether there has been an injury to domestic industry as a whole, looking to the enumerated factors and what other evidence the Commission deems appropriate.  19 U.S.C. §§ 1673d(b), 1677(4)(A), 1677(7)(B)(i)–(ii) .  And although it may well be an economic truth that underselling always has *some* effect on domestic industry—for example, in specific segments—it is by no means certain that this effect will manifest at the market-wide level.  This being the case, it is perfectly

permissible for the Commission to acknowledge underselling but still find no market-wide

injury.   The Commission need not segment the market.  *Copperweld*, 12 CIT at 165–66, 682 F.

Supp. at 569.  Put another way, it is no paradox to say that, despite underselling, domestic

industry suffered no injury *of the market-wide kind the Commission is looking for*.

Without a paradox, the Commission's conclusion of no material injury is not undermined.

And if the Commission's conclusion is not undermined, then *Altx* does not impose on the

Commission a duty to address any evidence or arguments—including Kelco's tendered evidence

of segment specific market-share fluctuations and price effects.   *Altx*, 25 CIT at 1117–18, 167 F.

Supp. 2d at 1374.  To require the Commission to discuss market-segmented data in such a case

would be to add to the Commission's statutory duty—and that is beyond this court's mandate.

*Viraj Grp.*, 343 F.3d at 1377–78.

Kelco also raises an arbitrariness challenge to the Commission's decision to forego

consideration of segment-specific price effects in its material-injury analysis.  Kelco notes that

the Commission did look to segment-specific price effects in its threat-of-material-injury

analysis.  Pl.'s Br. 29 (quoting Views at 50).  Because the Commission was then willing to pierce

the veil and find a likelihood of future oilfield-segment price depression, Kelco argues, it should

have done the same with material injury.  *Id.*  But neither the change in approach nor the

different conclusion about possible future price effects undermines the Commission's present-

injury conclusion. Regarding the different conclusion, the present-material-injury and threat-of-

future-injury inquiries are statutorily and substantively discrete.  *Compare* 19 U.S.C.

§ 1677(7)(C), *with id.* § 1677(7)(F) (establishing different inquiries with different elements for

present-injury and threat analyses).  And with respect to the change in approach, this court has

afforded the Commission a wide berth in choosing when and when not to consider market-

segment data in its injury analyses.  In *Cleo*, for example, this court upheld a material injury

finding after passing over without comment the Commission's decision to discuss market

segments when analyzing volume and price effects, but not impact.  30 CIT at 1400.  The court

did so even despite the fact that the Commission had provided only the cursory explanation that

it had discussed segments "when appropriate."  *Id.*   The Commission's material-injury analysis

was acceptable to the court given the clear statutory language indicating that the Commission's

task is to analyze injury to domestic industry as a whole.  *See id.*  The gap between the

Commission's use and nonuse of segmentation is less drastic in this case, insofar as the

Commission's only resort to market segments comes under a different statutory heading than the

nonuse that Kelco complains of.  *See* Pl.'s Br. 29 (quoting Views at 50).  Thus, although the

Commission's duty to articulate a "rational connection between the facts found and the choice

made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), can in some

cases require it to adopt like analyses in like situations, *cf. Altx*, 25 CIT at 1110–12, 167 F. Supp.

2d at 1366–68, the Commission cannot be said to be in breach of that duty in this case.

    In any event, the Commission did acknowledge the segment-based market-share trends

that Kelco had pointed out—albeit to a limited extent. *Compare* Views at 37 n.142, *with* Post-

hr'g Br. 5–6.  In light of this partial acknowledgement and also the reasoning adduced above, the

mere fact that the Commission did not acknowledge segment-specific price-effects trends does

not render the Commission's material-injury finding unsupported by substantial evidence.  Pl.'s

Br. 27–30.

**II.     The Commission's Determination that the Filing of the Petition Did Not Result in Post-petition Effects Was Procedurally in Accordance with Law and Was Supported by Substantial Evidence**

Kelco's second claim is that the Commission should have discounted the injury data that followed the filing of the petition.  Pl.'s Br. 4–25; Reply Br. 2–11.  As discussed above, the Commission chose not to provide a post-petition discount after it evaluated the possibility in a footnote:

> Although there is some evidence showing purchasers approached domestic producers with sales inquiries after the petition was filed, the record shows no apparent changes in the subject imports' volume and pricing behavior in the second half of 2012, *i.e.*, after the petition was filed.  Accordingly, we decline to give less weight to the annual 2012 data based on a post-petition effect.

Views at 56 n.223.  Kelco claims that the Commission made the wrong decision, and supports this claim with two arguments:  First, the Commission did not follow the proper statutory procedure in evaluating the possibility of post-petition effects, Pl.'s Br. 7–23 & n.1; Reply Br. 4–6, 10–11;  and second, as a substantive matter, the Commission's determination of no post-petition effects was not supported by substantial evidence, Pl.'s Br. 7–20.  Both arguments are without merit.  And even if either argument were meritorious, the Commission's error would be harmless.

**A.     The Commission's Determination of No Post-petition Effects Was Procedurally in Accordance with Law**

Kelco first argues that the Commission's determination of no post-petition effects was procedurally improper, insofar as the Commission failed its statutory obligation to consider "whether any change in [the injury factors] since the filing of the petition . . . is related to the pendency of the investigation."   19 U.S.C. § 1677(7)(I).  Kelco's argument has three prongs:  (1) The Commission did not adequately "consider" the possibility of post-petition effects within the meaning of the statute, *see* Reply Br. 4–6, Pl.'s Br. 20–23, (2) the Commission failed to presume

that any post-petition effects arose from the filing of the petition, Pl.'s Br. 5–8 & n.1, 20–23,

Reply Br. 10–11, and (3) the Commission did not, but was procedurally required to, analyze

post-petition effects via a market-segmentation analysis, *see* Pl.'s Br. 7–20.

   In the first prong of its argument, Kelco asserts that the Commission's evaluation of post-

petition data did not live up to the statutory directive to "consider" post-petition effects.  Reply

Br. 4–6.  According to Kelco, in order to comply with statute, the Commission must collect post-

petition data, compile it in the staff report, and discuss it in the Views of the Commission.  Reply

Br. 4 (citing *Gold East Paper (Jiangsu) Co. v. United States*, 36 CIT __, __, 896 F. Supp. 2d

1242, 1260 (2012)).  Specifically, Kelco argues that the Commission should have dedicated more

text to post-petition effects, and should have placed such text above the footnote line.  Reply Br.

4–6.[7]

   Even assuming Kelco is correct about the inquiry required by the term "consider,"

Defendant's Views of the Commission discussion was sufficient.  Contrary to Kelco's

contention, the Commission's discussion in the Views of the Commission need not be of some

talismanic length or in some preordained place.  *See, e.g.*, *Nitrogen Solutions Fair Trade*

---

[7] In setting forth its alleged consideration rule, Kelco misquotes *Gold East Paper*.  According to Kelco, *Gold East Paper* defines consideration to include "collecting data, compiling the data in the staff report, and discussing those data in the Commission's final views."  This quotation is properly attributed to Defendant-Intervenor Jungbunzlauer Austria AG's brief.  Def.-Intervenor's. Opp. to Pl.'s Mot. 4, ECF No. 45.  The distinction is important, because *Gold East Paper* need not be read to define consideration at all (much less so strictly); the case can be read simply for the proposition that, the facts of that case being as they were, the defendant did enough to satisfy 19 U.S.C. § 1677(7)(I) by taking the three mentioned steps: collecting, compiling, and discussing data.  36 CIT at __, 896 F. Supp. at 1260.

   Moreover, even assuming that *Gold East Paper* does set forth a rule on what it means to "consider" post-petition effects, Kelco is still incorrect about how much discussion the case requires the Commission to offer in its final views.  According to Kelco, "The [*Gold East Paper*] Court found th[e post-petition effects] claim unfounded based on three pages of discussion in the Commission's final views and the staff report where post-petition effects were evaluated.  The Commission's footnote in the present case hardly compares . . . ." Reply Br. 5 (citation omitted).  But there was just one paragraph of discussion in the Views of the Commission report at issue in *Gold East Paper*. *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from China and Indonesia*, USITC Pub. 4192, Inv. Nos. 701-TA-470–471, 731-TA-1169–1170, at 27 (Nov. 2010) (final determination).

*Committee v. United States*, 29 CIT 86, 101, 358 F. Supp. 2d 1314, 1329 (2005) (sustaining

Commission's determination that domestic industry neither suffered material injury nor was

threatened by such, even when Commission's finding of no post-petition effects was premised on

one footnote of analysis in the relevant Views of the Commission report, in which the

commission asserted that the alleged effect of the petition began before the petition was filed,

*Urea Amonium Nitrate Solutions from Belarus, Russia and Ukraine*, USITC Pub. 3591, Inv.

Nos. 731-TA-1006–1008, at 15 n.85 (Apr. 2003) (final determination)).  In this case, the

Commission offered some discussion of post-petition effects, which was all that it was statutorily

required to do.  Views at 56 n.223; *see* U.S.C. § 1677(7)(I).  Kelco's argument that the

Commission did not follow the "consideration" process therefore fails.

The second prong of Kelco's argument is that the Commission, in evaluating post-

petition effects, ignored its past practice of presuming that any detected effects had been caused

by the filing of the petition.  Pl.'s Br. 5–8 & n.1, 20–23, Reply Br. 10–11.  This procedural prong

of Kelco's argument can be disposed of without reaching the necessary substantive assumption

that there were any post-petition effects, because Kelco's purported presumption does not exist.[8]

When an agency does establish a consistent practice, this can sometimes bind it to at least

explain any departure therefrom.  *E.g.*, *Consol. Bearings Co. v. United States*, 348 F.3d 997,

1007 (Fed. Cir. 2003) (holding that agency acts arbitrarily and capriciously when it "consistently

followed a contrary practice in similar circumstances and provide[s] no reasonable explanation

for the change in practice").  But, as noted, the wrinkle in this case is that Kelco has not

sufficiently demonstrated that its claimed practice has ever been adopted by the Commission.

Kelco cites but one Commission investigation, *Certain Cold-Rolled Steel Products from*

---

[8] It should be noted, however, that this court does sustain the Commission's conclusion that there were no post-petition effects as being supported by substantial evidence.  *See* Discussion Part II.B, *infra*.

*Argentina, Belgium, Brazil, China, France, Germany, Korea, the Netherlands, New Zealand,*

*Russia, South Africa, Spain, Taiwan, Turkey, and Venezuela*, USITC Pub. No. 3551, Inv. Nos.

701-TA-423-425 & 731-TA-964, 966–970, 973–978, 980 & 982–983, at 9 (Nov. 2002) (final

determination), as evidence of the apparent practice, and specifically references language that is

at best ambiguous on the issue:

> The statute allows the Commission to reduce the weight accorded to data for the
> period after the filing of the petition upon considering whether any change in the
> volume, price effects, or impact of imports since the filing of the petition is
> related to the pendency of the investigation.  The presumption that such change is
> related to the pendency of the investigation is rebuttable.

Pl.'s Br. 7 n.1; Reply Br. 10–11.  One investigation does not make for a "consistent" practice.

And, in any event, the cited language does not prove Kelco's point:  A presumption to the

detriment of subject importers is mentioned, but nothing is said of how it is imposed or whether

such imposition is mandatory—the precise question at issue.  *Id.*[9]  Thus, Kelco has not

---

[9] Furthermore, the legislative history of 19 U.S.C. § 1677(7)(I) provides some indication that the presumption mentioned is not mandatory, but is imposed by the Commission at its discretion.  In substance, that history says that the Commission *may* presume that post-petition effects result from the petition, and *may* require subject producers to overcome this presumption, on penalty of discounting the post-petition data.  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 853–54 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4186.

This legislative history also undermines a perhaps-implied argument that the statutory text (rather than agency practice) requires the Commission to presume that any post-petition effects are caused by the filing of the petition.  *See* Pl.'s Br. at 6–7.  Another more obvious argument against such a statutory construction is that the statutory text itself does not mention any presumption.  19 U.S.C. § 1677(7)(I).  And the would-be statutory argument is further undermined by the Commission's clear discretion to discount or not discount post-petition data should it discover post-petition effects attributable to the filing of the petition.  19 U.S.C. § 1677(7)(I) ("[T]he Commission *may* reduce the weight accorded to the data for the period after the filing of the petition . . . ."); *Altx*, 25 CIT at 1105 n.10, 167 F. Supp. 2d at 1361 n.10 ("[T]he ITC, therefore, is not required to discount the relevant data even if the agency finds a change in data to be related to the pendency of the investigation.").  It is unclear why Congress would mandate that the Commission presume that post-petition effects are caused by the filing of the petition, but then allow the Commission discretion to nonetheless provide little or no post-petition discount.  *Cf. United Savings Ass'n v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.").

established that the Commission has a past practice of presuming that post-petition effects are

caused by the filing of the petition.[10]

The final prong of Kelco's procedural argument—that the Commission was required to

conduct a market-segmentation analysis as a matter of law—also fails.  Just as the Commission

is under no procedural obligation to segment the market when conducting its more general

material-injury determination, neither must the Commission do so when considering post-

petition effects.  After all, the primary reason that market segmentation is not required in the

general material-injury context is that the definition of the term "industry" in 19 U.S.C.

§ 1677(4)(A)—both on its face and as interpreted by this court—regards industry as a whole.

*See, e.g.*, *Cleo*, 30 CIT at 1400.  That same term "industry" is used again in 19 U.S.C.

§ 1677(7)(I), the section that sets forth the court's task in evaluating post-petition effects.  There

is no reason to believe that the meaning of "industry" should shift from context to context,

*Ratzlaf v. United States*, 510 U.S. 135, 143 (1994), all the less so because the term is centrally

and uniformly defined.  Therefore, the Commission cannot have erred as a procedural matter by

declining to segment its analysis of post-petition effects.  *See Viraj Grp.*, 343 F.3d at 1377–78.

## B.  The Commission's Determination of No Post-petition Effects Was Supported by Substantial Evidence

Because the Commission's post-petition-effects determination was procedurally in

accordance with law, the only remaining question is whether it was unsupported by substantial

evidence.  Kelco again founds its substantial-evidence argument on the *Altx* rule that the

---

[10] Kelco also supports its presumption argument by reciting a statement by Commissioner Aranoff at the hearing below:  "The statute tells me that I *can* presume that any improvements are due to the petition and I *can* give them less weight in my determination unless there are facts on the record that can overcome that presumption."  Pl.'s Br. 21 (quoting Revised Commission Hr'g Tr. at 260–61, PD 264 (July 30, 2013), ECF No. 17 (Nov. 4, 2013) (emphasis added) (internal quotation marks omitted)); Reply Br. 10–11 (same).  It is unclear what Kelco would have this court do with Commissioner Aranoff's statement, which itself is not evidence of past Commission practice.  Nor, in any event, does the quoted statement, which treats the presumption as optional, support Kelco's point.

Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions."  25 CIT at 1117–18, 167 F. Supp. 2d at 1374.  This time, Kelco alleges that the Commission's conclusion of no post-petition effects was undermined by record evidence of a post-petition decline in relative demand for oilfield-segment imports—evidence that the Commission did not acknowledge.  Pl.'s Br. 8–12; Reply Br. 6–7.  Kelco further contends that three pieces of record evidence show that the petition was the cause of this decline: (1) reports by C.P. Kelco and [[          ]] that they experienced [[          ]] post-petition effects, Pl.'s Br. 13–15; Reply Br. 10, (2) one prominent oilfield-segment purchaser's shift of [[                    ]] of supply from subject imports to domestic supply, Pl.'s Br. 15–18; Reply Br. 7–8, and (3) purchasers and importers' documentation of post-petition changes in subject importers' import volume and pricing behavior, Pl.'s Br. 18–20; Reply Br. 9–10.

The problem, once again, is that the evidence Kelco claims the Commission unduly ignored—evidence of a segment-specific decline in relative demand—is not significant, undermining evidence within the meaning of *Altx*.  As shown above in Discussion Part II.A, the Commission's task in evaluating post-petition effects is to look to the industry as a whole.  19 U.S.C. § 1677(4)(A), (7)(I).  To hold that evidence of segment-specific post-petition effects is *Altx* significant, such that it necessarily requires the Commission's consideration, is to amplify the Commission's statutory task.  This the court cannot do.  *See Viraj Grp.*, 343 F.3d at 1377–78.

Kelco suggests alternatively that it is past Commission practice, not *Altx*, that requires the Commission to consider segment-specific post-petition effects.  *See* Pl.'s Br. 11–12 (citing *Certain Activated Carbon from China*, USITC Pub. 3913, Inv. No. 731-TA-1103, at 17 (Apr. 2007) (final determination)).  As already noted, past Commission practice can sometimes bind future decision-making.  *Consol. Bearings*, 348 F.3d at 1007.  But the difficulty is that Kelco's

cited investigation does not demonstrate any such past Commission practice.  In *Certain*

*Activated Carbon*, the Commission provided a post-petition discount after finding that the filing

of the relevant petition triggered a *market-wide* decline in *absolute* demand for, *and* increase in

price of, subject imports.  *Certain Activated Carbon from China*, USITC Pub. 3913, Inv. No.

731-TA-1103, at 17 (Apr. 2007) (final determination).  Thus, *Certain Activated Carbon* does not

require the Commission to examine segment-specific effects.

In any event, the Commission *did* respond to Kelco's segment-specific post-petition

cause-and-effect evidence.  As mentioned above, the Commission evaluated post-petition effects

in a footnote.  The Commission stated,

> Although there is some evidence showing purchasers approached domestic
> producers with sales inquiries after the petition was filed, the record shows no
> apparent changes in the subject imports' volume and pricing behavior in the
> second half of 2012, *i.e.*, after the petition was filed.  Accordingly, we decline to
> give less weight to the annual 2012 data based on a post-petition effect.

Views at 56 n.223.  In this footnote, the Commission acknowledged the causation proof offered

by Kelco, albeit in a limited manner.  That proof tended to show an [[          ]] in domestic

producers' post-petition activity—precisely the "some evidence" that the Commission

mentioned.  Pl.'s Br. 12–20, 22; Reply Br. 6–11.  And the Commission followed this mention

with an explanation of why the causation proof did not necessarily lead to a finding of post-

petition effect:  Looking to the market as a whole, two of the hallmark vectors for evaluating

both material injury and post-petition effect—volume and price, 19 U.S.C. § 1677(7)(I)—

registered "no apparent change" after the filing of the petition.  Views at 56 n.223.[11]  The

Commission's reliance on volume, in particular, should not have been unexpected, insofar as the

---

[11] The fact that the Commission expressly acknowledged only two out of the three post-petition-effects factors in its footnote is of no concern.  In the material-injury context, the Commission is permitted to value volume, price effects, and impact as it sees fit.  *Copperweld*, 12 CIT at 156, 682 F. Supp. at 561–62.  There is no reason this should not also be true in the case of post-petition effects.

Commission has looked to this metric in the past in considering post-petition effects, and to the

approval of this court. *See, e.g.*, *Nitrogen Solutions*, 29 CIT at 101, 358 F. Supp. 2d at 1329

(sustaining Commission's finding of no post-petition effects in which Commission looked

primarily to decline in absolute volume of subject imports, determining that the decline predated

the petition); *Corus Staal BV v. U.S. Int'l Trade Comm'n*, 27 CIT 459, 463, 470 (2003)

(sustaining Commission's finding of post-petition effects in which Commission looked primarily

to decline in absolute volume of subject imports).  Therefore, even assuming the Commission

was required to respond to evidence of segment-specific post-petition effects, it did so.  The

Commission's post-petition finding survives substantial evidence review.

> **C.    Even Assuming that the Commission's Determination of No Post-petition Effects
>          Was Not Supported by Substantial Evidence or Otherwise Not in Accordance
>          with Law, the Error Is Harmless**

Finally, the court notes that any error in the Commission's finding of no post-petition

effects was harmless.  Even assuming the Commission had found post-petition effects, its

ultimate injury finding would not have changed.  Def.'s Opp. to Pl.'s Mot. 35–36, ECF No. 36

("U.S. Br.").

"It is well settled that principles of harmless error apply to the review of agency

proceedings." *Intergcargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996).  Nor

does this general rule have any less force when applied to the Commission's determinations of

material injury. *See U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1367 (Fed. Cir. 1996)

(noting that, even had court agreed with plaintiff that Commission erred in its usage of two

pieces of record evidence, the error was harmless because the Commission's determination was

supported by substantial other record evidence).

Had the Commission found the post-petition effects alleged by Kelco, it would have had

discretionary authority to "reduce the weight accorded to the data for the period after the filing of

the petition." 19 U.S.C. § 1677(7)(I). It is not for this court to say how the Commission would

have exercised its own statutory discretion in deciding to provide a discount or not. Reply Br. 2–

3. Nor can the court say what precise level of discretionary discount the Commission might have

provided. But the court can consider what the impact on the Commission's material-injury

determination would have been had the Commission acted to the full extent of its authority in

discounting post-petition data.

The Commission convincingly demonstrates that, even assuming a total discount of post-

petition data, its material-injury determination would have remained the same. Had the

Commission discounted the post-petition data, it would have looked to earlier data from 2010 or

2011 to detect material injury from less-than-fair-value importation. U.S. Br. 35–36. But the

statutory factors that the Commission would have been obligated to consider would have

remained the same: volume of subject imports, price effects on domestic industry, and impact on

domestic performance indicators. 19 U.S.C. § 1677(7)(I); *see* U.S. Br. 35–36. With respect to

each of these statutory factors, the 2010 and 2011 data is not substantially different from the

2012 data. Views at 37 (volume) (citing Staff Report at C-5 tbl.C-1); *id.* at 48, 56–58 (price

effects) (citing V-6, V-7 tbls.V-1 to V-16); Staff Report at VI-8 tbl.VI-6, C-5 tbl.C-1 (impact).

Nor has Kelco provided evidence that the relevant metrics fluctuated meaningfully during 2012,

but before the filing of the petition. *See* Pl. Br. Ex. 3 (summarizing data from the Staff Report at

III-7 tbl.III-4, V-7 tbls.V-1 to V-14, showing no change in volume in three out of five market

segments between the first and second halves of 2012).

This court has already found that the Commission's determination of no material injury during the entire POI—from 2010 to 2012—was valid under the assumption that the Commission was not obligated to provide a post-petition discount.  *See supra* Discussion Part I. If the Commission's determination as to the entire POI is valid, and if the data from 2010 and 2011 is not meaningfully different than the data from 2012, then it must be the case that a determination of no material injury from 2010 to 2011 is also valid.  Therefore, it makes no difference whether or not the Commission provided a post-petition discount:  The result is the same.  The Commission's finding that domestic industry suffers no material injury stands.

## <u>CONCLUSION</u>

After carefully reviewing the parties' briefs and the administrative record, the court sustains the Commission's decision in all respects.  Judgment will enter accordingly.

<u>/s/ Richard W. Goldberg</u>
Richard W. Goldberg
Senior Judge

Dated:  October 22, 2014
New York, New York